**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **MUNIRAH HASHIM,** | § | |
| **Plaintiff,** | § | |
| **v.** | § | **Civil Action No. 3:22-CV-1414-X-BH** |
| | § | |
| **COMMISSIONER OF SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| **Defendant.** | § | **Referred to U.S. Magistrate Judge**[1] |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**

Based on the relevant filings, evidence and applicable law, the final decision of the Commissioner of Social Security (Commissioner) denying the plaintiff's claims for Supplemental Security Income (SSI) under Title XVI of the Social Security Act should be **AFFIRMED**.

## I.     BACKGROUND

Munirah Hashim (Plaintiff) filed her application for SSI on February 25, 2019, initially alleging disability beginning on November 7, 2018. (R. at 248.)[2] Her claim was denied initially on September 9, 2019, and upon reconsideration on January 17, 2020. (R. at 72-84, 87-105.) After requesting a hearing before an Administrative Law Judge (ALJ), she appeared and testified at a telephonic hearing via a Burmese interpreter on November 5, 2020. (R. at 35-52, 137-39.) On December 29, 2020, the ALJ found her not disabled. (R. at 106-16.) On January 14, 2021, Plaintiff appealed the ALJ's decision to the Appeals Council, which vacated the hearing decision and remanded the case for consideration of evidence from a treating physician that had been received on June 18, 2019. (R. at 122.)

---

[1] By *Special Order 3-251*, this social security appeal was automatically referred for proposed findings of fact and recommendation for disposition.

[2] The background information is summarized from the record of the administrative proceedings, which is designated as "R." (*See* doc. 19-1–doc. 19-10.) Citations to the record refer to the page numbers at the bottom of each filing; citations to the parties' filings refer to the CM/ECF system page number at the top of each page.

On December 28, 2021, Plaintiff appeared and testified via a Burmese interpreter at a telephonic hearing. (R. at 58-76.) On January 6, 2022, the ALJ found her not disabled. (R. at 13-29.) On January 18, 2022, Plaintiff appealed the ALJ's decision to the Appeals Council, which denied her request for review on May 13, 2022, making the ALJ's decision the final decision of the Commissioner. (R. at 1-3, 245-47.) She timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (doc. 1.)

**A.  Age, Education, and Work Experience**

Plaintiff was born on January 1, 1987; she was 32 years old when she filed her application on February 25, 2019. (R. at 248, 253.) She lacked a general education and was illiterate. (R. at 282, 284.) She had past relevant work as a kitchen helper and a warehouse worker. (R. at 284.)

**B.  Medical Evidence**

On February 5, 2017, Plaintiff was brought to the emergency room (ER) by ambulance after she was the victim of domestic violence, assault, and battery. (R. at 491-511.) Imaging showed an asymmetrically enlarged right lobe of the thyroid with multiple nodules, right hepatic mass suggestive of a hemangioma, suspected contusion of the right pelvis, and multilevel degenerative changes and straightening of cervical lordosis. (R. at 497, 500.) Imaging also showed straightening of the thoracic and lumbar spine, evidence of old granulomatous disease, and a mass in the right lobe of the thyroid gland. (R. at 501-02.)

On March 17, 2018, Medical City Dallas performed an endoscopy. (R. at 618-50.) Plaintiff was assessed with acute respiratory failure, altered mental status, bleach ingestion, throat pain, and suicide attempt, and she was transferred to inpatient psychiatry. (R. at 623, 625-26.)

On November 14, 2018, Metrocare Services (Metrocare) completed a psychiatric evaluation. (R. at 687-91.) Plaintiff, who was accompanied by a social worker, reported

depression, fatigue, excessive worry, and flashbacks from past abuse. (R. at 687-89.) She had depressed mood and constricted affect but an otherwise normal mental status examination. (*Id.*) The assessment comments were posttraumatic stress disorder (PTSD), major depressive disorder recurrent moderate, generalized anxiety disorder, and victim of domestic abuse. (R. at 690.)

On February 21, 2019, Plaintiff returned to Metrocare, complaining of daily headaches, dizziness, and fainting attacks, which she ascribed to trauma resulting from the February 2017 domestic violence. (R. at 693-95, 806-08.) She reported feeling "very stressed" because her children did not live with her. (R. at 693, 806.) She was accompanied by a caseworker. (*Id.*) She had immigrated from Burma and spoke Burmese, and her history was obtained via an interpreter over the telephone. (*Id.*)

On March 20, 2019, Plaintiff visited the ER, complaining of fatigue and headaches. (R. at 900-04.) A social worker provided Plaintiff's medical history, stating that Plaintiff reported forgetfulness and repeating herself. (R. at 901.) Plaintiff cried and appeared anxious, and she was found to be a poor historian. (*Id.*)

On April 25, 2019, Plaintiff presented to Medical City Green Oaks Hospital accompanied by two counselors from Adapt Mobile Crisis. (R. at 707-11.) She was tearful, sad, and suicidal without a plan; she endorsed mild anxiety and mild intermittent confusion; and she had poor grooming. (R. at 707, 710.) She reported difficulty sleeping and depression since her husband had left her and taken their children. (R. at 707-08.) She presented as anxious and in a depressed mood and anxious psychomotor state but had an otherwise normal mental status exam. (R. at 710-11.) She was assessed with major depressive disorder, recurrent, severe, without psychosis. (R. at 711.) Two months later, she returned to Metrocare, alone, complaining of ongoing depression and multiple somatic concerns. (R. at 877-79.) She was assessed with depression, headaches, PTSD,

3

generalized anxiety disorder, other specified problems related to psychosocial circumstances, and unspecified illness. (R. at 878.)

On August 30, 2019, Peggy Auguste, Ph.D., completed a consultative examination via a Burmese interpreter. (R. at 865-71.) Plaintiff reported speaking "very little English" and lacking a formal education. (R. at 866, 873.) She "served as [the] primary informant" but was "less than reliable"; her neighbor also provided information. (R. at 866.) She was tearful and had depressed mood, limited attention, and limited concentration. (R. at 869.) She demonstrated functional limitations in acquiring and using information, attending and completing tasks, and interacting and relating with others; she was diagnosed with major depressive disorder and PTSD. (R. at 870-71.)

On October 28, 2019, Plaintiff visited Metrocare; she had a sad mood and reported ongoing nightmares and increased anxiety. (R. at 894-95.) Weeks later, she returned to Metrocare, reporting that she was doing well.  She had a normal mental status examination, and she was assessed with severe major depression, generalized anxiety disorder, and PTSD. (R. at 1134-35.)

On November 12, 2020, Plaintiff had a motor vehicle accident and presented to the ER for pain in her back, right elbow, neck, and abdomen. (R. at 980-87.) She had multiple contusions, but she had a normal mental status examination and unremarkable imaging. (R. at 982, 984-85, 987.)

On April 26, 2021, thyroid imaging revealed two right lobe nodules. (R. at 1031.) On May 18, 2021, Plaintiff underwent a total thyroidectomy. (R. at 1498-99.) On June 25, 2021, she reported depressed mood and pain since her thyroidectomy, and she was assessed with postoperative hypothyroidism, papillary thyroid carcinoma, and major depressive disorder. (R. at 1367-68.) Days later, she was referred for evaluation of papillary thyroid cancer post-surgery, and she was advised to undergo radioactive iodine ablation. (R. at 1200-04.)

**C. November 5, 2020 Hearing**

On November 5, 2020, Plaintiff and an impartial VE testified at a hearing before the ALJ.[3] (R. at 40-57.) Plaintiff was represented by an attorney. (*Id.*)

### 1. Plaintiff's Testimony

On cross-examination, Plaintiff testified that she lacked a formal education and that she had not worked since November 2018. (R. at 40.) Her three children lived with her, and she spent most days at home with her 4-year-old son; she was separated from her husband. (R. at 42-43.)

She cooked and prepared food in her prior kitchen job and assembled cellphones at her prior warehouse job, but she quit both jobs because she was unable to perform them "functionally". (R. at 40-41, 46-47.) She had worked in other positions but not for "very long". (R. at 40-41.) She had been treated for physical and mental injuries resulting from domestic violence. (R. at 41-42.)

Plaintiff could not drive "all the time" due to headaches; when she drove, she turned on the emergency lights. (R. at 43.) She socialized with and was helped by the Burmese community, and she received government assistance. (R. at 44-45.) Her 15-year-old daughter helped her manage her money. (R. at 44-45.)

### 2. VE's Testimony

The VE testified that Plaintiff had past work as a kitchen helper (DOT 318.687-010, medium, SVP-2) and an "assembler comma production" (DOT 706.687-010, light, SVP-2). (R. at 49.)

The VE considered a first hypothetical individual with Plaintiff's age, education, and past work experience who had no exertional limitations but some mental and environmental limitations. (*Id.*) The individual could not perform past work, but she could perform as a table worker (DOT

---

[3] Plaintiff testified via a sworn Burmese interpreter. (R. at 40.)

739.687-182, sedentary, SVP-2), with 125,000 jobs nationally; patcher (DOT 723.687-010, sedentary, SVP-2), with 67,000 jobs nationally; and bakery worker (DOT 524.687-022, light, SVP-2), with 165,000 jobs nationally. (R. at 50.) A second hypothetical individual with the same residual functional capacity (RFC) as the first, but who would be off task at least 15 percent of the time, could not perform competitive work. (*Id.*)

On cross-examination, the VE opined that a third hypothetical individual who could learn only by hands-on demonstration, i.e., with no verbal instruction, could still perform these jobs because they required "just one, two-step processes." (*Id.*) A question regarding a fourth hypothetical individual who could perform jobs with a reasoning level of one and a language level of one prompted the following exchange between the ALJ and the attorney:

> ALJ:         Well, the language barrier is dealt within the grid rules. That's actually not appropriate in an RFC. The inability to speak English, it's handled in the grid rules.
>
> Attorney:   Well, you could still have a limited ability to speak English, and it's still addressed in the DOT though, as I understand it, Judge. I mean, this isn't really a grid rules question.
>
> ALJ:         Right, but if you look at HALLEX or any of those, the inability to speak English is dealt with in the grid rules.
>
> Attorney:   All right. Never mind, then, [the VE]. And I don't have any more questions.

(R. at 51.)

## D.  December 28, 2021 Hearing

On December 28, 2021, Plaintiff and a second VE testified at a hearing before the ALJ.[4] (R. at 58-76.) Plaintiff was represented by an attorney. (*Id.*)

---

[4] Plaintiff again testified via a Burmese interpreter. (R. at 55.)

### 1.  *Plaintiff's Testimony*

Plaintiff testified that she had a Texas driver's license and knew how to drive. (R. at 59.) She did not have any formal education or attend school before coming to the United States. (*Id.*) She understood "very basic English" because she attended an English as a second language course when she arrived in the United States. (*Id.*)

She had not worked since she quit her kitchen job, where she was tasked with washing dishes, cutting vegetables, cleaning, and doing whatever else was necessary. (R. at 60.) She had also worked at a warehouse where she assembled cellphone parts; her training consisted of being "show[n] … how to assemble things" and her supervisor "also g[a]ve her instructions [on] how to do things." (R. at 61.) Plaintiff stated that she was "very" forgetful, did not think she could concentrate "even" on a simple command, and "[she] also ha[d] a language problem." (R. at 63.)

### 2.  *VE's Testimony*

The VE testified that Plaintiff had past work as a kitchen helper (DOT 318.687-010, medium, SVP-2) and cellphone assembler (DOT 729.684-026, light work, SVP-4). (R. at 65.)

The VE first considered a hypothetical individual with Plaintiff's age, education, and past work experience who could perform work at all exertional levels, had environmental and mental limitations, had limited interactions with others, and would "need to learn by demonstration where the supervisor would deliver work instructions verbally or by a hands-on demonstration with verbal confirmation of understanding from the individual." (R. at 65-66.) The VE testified that the individual could perform past work as a kitchen helper as well as a laundry worker (DOT 361.687-018, medium, unskilled), with 150,000 jobs nationally; store laborer (DOT 922.687-058, medium, unskilled), with 70,000 jobs nationally; and industrial cleaner (DOT 389.683-010, medium, unskilled), with 195,000 jobs nationally. (R. at 66.) Because learning by verbal or hands-on

demonstration is not specifically addressed by the DOT, the VE's answers were based on her more than 35 years of experience in vocational rehabilitation and job placement. (R. at 67-68.)

On cross-examination, the VE considered a third hypothetical individual with the same limitations and restrictions as the first, except she could only learn by hands-on demonstration (with no verbal instruction), perform unskilled work with a DOT language development level one, and have limited interaction with others. (R. at 68-69.) She first explained that the laundry worker and industrial cleaner—but not the store laborer—had a language development level one. (R. at 69.) The cross-examination continued:

Attorney: And the other two limitations [e.g., she could learn only by hands-on demonstration and she would have limited interaction with others] would affect those answers?

VE: I don't think so. I mean, no. In my opinion, no, because they pretty much can work independently once they're shown the job and coworkers, I mean, so—no. That would not change my opinion.

Attorney: Okay. And let me see here if there's anything else I wanted to ask, I don't think so. Yeah, I do kind of want to ask another question. If the same, if that same individual, if we add to that is not able to ask simple questions or request assistance because of language limitations, would that change the answers that you gave or not?

VE: Yes, it would.

Attorney: And how would it change?

VE: If [she is] not able to ask for help in any situation, no, there would be no jobs.

ALJ: Now, they're in a—let me just get clarification because the inability to speak English, that's in the grid rules. Are you saying based on some other issue, you know, based on a physical or mental issues she's not able to ask for help?

Attorney: Well, if she's not able to communicate what she needs help with any other way, I know it's not in the grid rules but it's still a vocational consideration, I what [the VE]'s trying to say and if that individual has a limitation being able to ask for assistance, which is, you know, one of the 8315 issues to be considered and she's unable to do that, I think [the VE]'s saying that becomes a problem with the job performance.

8

ALJ:         Okay, anything else?

(R. at 69-70.)

**E.  ALJ's Findings**

The ALJ issued an unfavorable decision on January 6, 2022. (R. at 13-29.) At step one, she found that Plaintiff had not engaged in substantial gainful activity since February 12, 2019, the date her application was filed. (R. at 15.) At step two, she found that Plaintiff had the severe impairments of papillary thyroid cancer and postsurgical hypothyroidism, major depressive disorder, generalized anxiety disorder, and PTSD. (*Id.*) She also found that Plaintiff's migraine headaches, cervical and thoracic degenerative disc disease, and a left shoulder partial tear were nonsevere impairments, and that her body aches were not a medically determinable impairment. (R. at 15-16.) At step three, the ALJ concluded that Plaintiff's impairments did not singularly or in combination meet or medically equal the required criteria for any of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525-404.1526). (R. at 16-18.) She expressly considered Listings 12.04, 12.06, 12.15, and 13.09. (R. at 17.)

Next, the ALJ determined that Plaintiff retained the physical RFC to perform a full range of work at all exertional levels with some mental, environmental, and interactional limitations, and that she "is able to *learn by demonstration* where the supervisor delivers work instructions verbally or by hands-on demonstration with verbal confirmation of understanding from [Plaintiff]". (R. at 18) (emphasis added). At step four, she found, based on the VE's testimony, that Plaintiff could perform her past work as a kitchen helper. (R. at 26-27.) At step five, she found that transferability of job skills was not material to the determination of disability because the Medical-Vocational Rules supported a finding that Plaintiff was not disabled regardless of whether she had transferable job skills, but considering her age, education, work experience, and RFC, there were jobs that

existed in significant numbers in the national economy that she could perform. (R. at 33.) She also found that Plaintiff was illiterate. (R. at 27.) The ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, at any time since February 12, 2019, the date her application was filed. (R. at 28.)

## II.    STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* The court may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision.

*See id.*

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work [s]he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes h[er] from performing h[er] past work, other factors including age, education, past work experience, and [RFC] must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies her burden under the first four steps, the burden shifts to the Commissioner at step five to

11

show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III.    ISSUE FOR REVIEW

Plaintiff presents one issue for review:

> The Plaintiff did not retain the Language Development abilities to perform her past relevant work or other work that existed in significant numbers. [She] could not perform her past relevant work or other work with the found [RFC] as she could not verbally communicate in English.

(doc. 20 at 4.)

### A.  <u>Conflict with the VE's Testimony</u>

Plaintiff contends that the ALJ failed to resolve the conflict between the VE's testimony that she could perform the identified jobs and the DOT's language development requirement given that she lacked a formal education and "could not read or write English". (*Id.* at 14.) She also contends that the ALJ failed to resolve the conflict between the VE's testimony that she could perform the identified jobs despite her inability to "communicate verbally in English" and the ALJ's RFC that she could learn by verbal or hands-on demonstration with verbal confirmation of understanding from her. (*Id.* at 16.)

To be considered disabled, a claimant must have a severe impairment that makes her unable to perform her previous work or any other substantial gainful activity existing in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1505(a). According to the Code of Federal Regulations, "[w]ork exists in the national economy when there is a significant number of jobs (in

12

one or more occupations) having requirements [that a claimant is] able to meet with h[er] physical or mental abilities and vocational qualifications." 20 C.F.R. § 404.1566(b). It is the Commissioner's burden at step five to show that a claimant is capable of performing other gainful employment in the national economy. *See* 20 C.F.R. § 404.1520(a)(4)(i); *Greenspan*, 38 F.3d at 236. Once the Commissioner finds that jobs in the national economy are available to a claimant, the burden of proof shifts back to the claimant to rebut this finding. *See Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing *Fraga*, 810 F.2d at 1302).

The Commissioner may consult several different sources of evidence, including VEs and the DOT,[5] to determine when presumptively-disabled claimants can perform alternative and available work. *See Veal v. Soc. Sec. Admin.*, 618 F. Supp.2d 600, 608 (E.D. Tex. May 21, 2009). VEs assess whether jobs exist for a person with the claimant's precise abilities and help to determine complex issues, such as whether a claimant's work skills can be used in other work, and the specific occupations in which they can be used. *See* 20 C.F.R. §§ 404.1566(e), 416.966(e). The ALJ may rely on the testimony of a VE in response to a hypothetical question[6] or other similar evidence. *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000); *Bowling v. Shalala*, 36 F.3d 431,

---

[5] The DOT and its supplement, the Selected Characteristics of Occupations (SCO) defined in the Revised DOT, "comprise a comprehensive listing of job titles in the United States, along with detailed descriptions of requirements for each job, including assessments of exertional levels and reasoning abilities necessary for satisfactory performance of those jobs." *Veal v. Soc. Sec. Admin.*, 618 F. Supp.2d 600, 608-09 (E.D. Tex. May 21, 2009); *see Conaway v. Astrue*, No. 3:07-CV-0906-BD, 2008 WL 4865549, at *5 (N.D. Tex. Nov. 10, 2008) ("The DOT was promulgated by the Department of Labor to provide 'standardized occupational information to support job placement activities' .... [and] contain descriptions of the requirements for thousands of jobs in the national economy.") (internal citations omitted); *see Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990). The Commissioner recognizes the DOT/SCO publications as authoritative, and routinely relies on them "for information about the requirements of work in the national economy." *See* SSR 00–4p, 2000 WL 1898704, at *2.

[6] "The ALJ relies on VE testimony in response to a hypothetical question because the VE 'is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Benton ex rel. Benton v. Astrue*, 3:12-CV-874-D, 2012 WL 5451819, at *7 (N.D. Tex. Nov. 8, 2012) (quoting *Carey*, 230 F.3d at 145). A hypothetical question posed to a VE must reasonably incorporate all the claimant's disabilities recognized by the ALJ, and the claimant must be afforded a fair opportunity to correct any deficiencies in the hypothetical question. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).

436 (5th Cir. 1994).

SSR 00–4p[7] requires that prior to relying upon evidence from a VE to support a determination of disability, the ALJ must identify and obtain a reasonable explanation for any apparent conflicts between occupational evidence provided by a VE and information in the DOT. *See* 2000 WL 1898704, at *1-2. As part of the duty to fully develop the record, the ALJ has an "affirmative responsibility" to inquire of the VE on the record whether there is such an inconsistency. *Id.* at 4; *see Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016) (citations omitted).

A direct conflict may arise when the VE's testimony regarding the exertional or skill level of a particular job is facially different than that indicated in the DOT, or when the VE's testimony creates a conflict between the ALJ's RFC determination and the description of the jobs in the DOT. *See Carey v. Apfel*, 230 F.3d 131, 147 (5th Cir. 2000). Conversely, implied conflicts and exceptions occur under various unique circumstances when VEs are called to testify as to an individual claimant's capabilities. *See id.* at 146-47. Because the DOT cannot satisfactorily address every such situation, claimants are not permitted to scan the record for implied or unexplained conflicts and then present the conflict as reversible error. *See id.* Unless a direct and obvious conflict exists between the VE's testimony and the DOT, the ALJ meets the step five burden. *See* SSR 00–4p, 2000 WL 1898704 at *4; *Carey*, 230 F.3d at 146 (when a "direct and obvious conflict" exists between the VE's testimony and the DOT, the ALJ must resolve that conflict by determining whether the VE's explanation is reasonable and thus more reliable than the DOT); *Nichols v.*

---

[7] Because conflict between VE testimony and the DOT occurred with some frequency, the Commissioner issued SSR 00–4p to ensure that ALJs would expose and reconcile such conflict before relying on VE testimony. *See* SSR 00–4p, 2000 WL 1898704. SSRs represent "statements of policy and interpretations" adopted by the SSA that are "binding on all components" of the SSA. *See* 20 C.F.R. § 402.35(b)(1). While binding on the Administration, these interpretive rulings are not binding on the courts and need not be given the force and effect of law. *Batterton v. Francis*, 432 U.S. 416, 425 n.9 (1977) (noting the varying degrees of deference the rulings may be afforded). Courts may "rel[y] upon the rulings in evaluating ALJs' decisions," however. *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001) (per curiam).

*Comm'r of Soc. Sec. Admin.*, No. 10-CV-0651, 2011 WL 2669056 at *6 (N.D. Tex. June 10, 2011) (when indirect conflict did not undergo adversarial development at the administrative hearing, the VE "testimony may be relied upon without resolving the conflict as long as the record reflects an adequate basis for doing so"), *adopted by* 2011 WL 2669099 (N.D. Tex. July 6, 2011).

At the hearing, the ALJ described a hypothetical individual of Plaintiff's age, education, and past work experience with the same RFC, including "learn[ing] by demonstration where the supervisor delivers work instructions verbally or by hands-on demonstration with verbal confirmation of understanding from [Plaintiff]." (R. at 65-66.) The VE testified that the individual could perform four jobs that existed in significant numbers in the national economy: kitchen helper, laundry worker, store laborer, and industrial cleaner. (R. at 66.) She acknowledged that her testimony was consistent with the DOT, except for the issue of learning by verbal or hands-on demonstration, which the DOT does not address, and which she instead based on her more than 35 years of experience in vocational rehabilitation and job placement. (R. at 67-68.) On cross-examination, the VE opined that a hypothetical individual who could learn only by demonstration, with no verbal instruction, could indeed work independently once she was shown how to perform the job, even if the job had a language development level. (R. at 69.) The ALJ relied exclusively on the VE's testimony to determine that an individual with Plaintiff's RFC could perform other work as a kitchen helper, laundry worker, store laborer, and industrial cleaner. (R. at 26-28.)

The ALJ complied with her duty under SSR 00–4p by asking the VE, on the record, whether her testimony conformed to the DOT, and the VE responded in the affirmative. (R. at 67-68.) Although Plaintiff's attorney elicited testimony from the VE that the three identified jobs could not be performed by an individual who was "not able to ask for help in any situation", Plaintiff has presented no evidence to show that she is unable to ask for help "in any situation".

(*See* doc. 20.) In addition, Plaintiff's attorney failed to present any conflicts through cross-examination regarding her ability to perform her past work as a kitchen worker. (R. at 65-70.) Nothing at the hearing appears to have triggered any reason for the ALJ to elicit a "reasonable explanation" for any possible conflicts. *See Johnson v. Comm'r of Soc. Sec. Admin.*, No. 3:11-CV-3126-L, 2013 WL 632104, at *13 (N.D. Tex. Feb. 4, 2013), *adopted by* 2013 WL 628561 (N.D. Tex. Feb. 20, 2013) (citing *Gaspard v. Soc. Sec. Admin., Comm'r*, 609 F. Supp. 2d 607, 613-14 (E.D. Tex. Apr. 8, 2009)); *Graves*, 837 F.3d at 593 (noting that there is no violation of SSR 00–4p if the plaintiff fails to show the VE's "testimony was actually inconsistent with the DOT").

## B.  Language Development Conflict

Plaintiff argues that her inability to "read or write [in] English" conflicts with the DOT language development level one requirement for the identified jobs. (doc. 20 at 13-14.) She also argues that the ALJ failed to make a "finding of fact" regarding her "educational background or literacy" in her decision, to mention it to the VE, and to include it in the hypothetical. (*Id.* at 13.)

The DOT provides that every job in the national economy, including those identified here, requires at least language development level one, i.e., that an individual speak and write simple sentences, recognize the meaning of 2,500 (two- or three-syllable) words, and read at a rate of 95–120 words per minute. *See Towner v. Berryhill*, No. 3:18-CV-459 DPJ-LRA, 2019 WL 3539817, at *6 (S.D. Miss. July 17, 2019); *see also* 318.687-010 Kitchen Helper, 1991 WL 672755 (4th ed. 1991); 361.687-018 Laundry Laborer, 1991 WL 672992 (4th ed. 1991); 922.687-058 Laborer, Stores, 1991 WL 688132 (4th ed. 1991); 389.683-010 Sweeper-Cleaner, Industrial, 1991 WL 673279 (4th ed. 1991).

"Numerous district and appellate courts agree that an illiteracy finding conflicts with DOT literacy requirements." *Towner*, 2019 WL 3539817, at *6 (stating that a VE's opinion that an

16

illiterate claimant can do any job listed in the DOT "necessarily deviates" from the DOT's language requirements); *see*, *e.g., Migues v. Saul*, No. 6:18-CV-01611, 2019 WL 6827225, at *9 (W.D. La. Nov. 20, 2019) ("Thus, there is a conflict in the [VE]'s testimony that arises out of the claimant's assertion that [s]he is illiterate and out of the DOT's requirement of literacy for all jobs."), *report and recommendation adopted*, No. 6:18-CV-01611, 2019 WL 6827232 (W.D. La. Dec. 12, 2019); *Lopez v. Colvin*, No. 3:14-CV-00571-BH, 2015 WL 1473677, at *11 (N.D. Tex. Mar. 31, 2015) (finding that language level one "deviates" from claimant's "language limitations" because he testified at the hearing via a Spanish interpreter, his medical records listed Spanish as his language, he never indicated that he could write in English, and there was no evidence to the contrary); *Gonzalez-Cruz v. Comm'r of Soc. Sec.*, 294 F. Supp. 3d 164, 192 (W.D.N.Y. Mar. 14, 2018) (finding an "apparent conflict" between the DOT requirements of the jobs identified by the VE and the ALJ's conclusion that claimant was illiterate and unable to communicate in English).

Nevertheless, "not all these courts agree that reversal or remand is mandated", particularly where the VE gave specific testimony explaining why the identified jobs could be performed by an illiterate person who lacked a formal education. *Towner*, 2019 WL 3539817, at *6 (noting that illiteracy is not a *per se* disability, but remanding given that neither the DOT nor the VE's opinion "automatically controls", and absent such evidence, the ALJ's step 5 finding could not be supported by substantial evidence); *see*, *e.g., Charles v. Astrue*, 291 F. App'x 552, 555 (5th Cir. 2008) (unpublished) (finding that the regulations suggest and the VE testified that "persons who are functionally illiterate in English can still perform a significant number of unskilled jobs in the national economy, including the ones identified") (internal citation omitted); *Spears v. Colvin*, No. 3:14-CV-763-TSL-RHW, 2015 WL 7307247, at *4 (S.D. Miss. Oct. 16, 2015) (citing *Charles* and stating that "the regulations contemplate that an illiterate person can still perform a significant

number of jobs in the economy"), *report and recommendation adopted*, No. 3:14-CV-763TSL-RHW, 2015 WL 7345758 (S.D. Miss. Nov. 19, 2015); *Migues*, 2019 WL 6827225, at *9 (citing *Charles* and stating in dicta that "the DOT [language development] requirement defies common sense because persons who are functionally illiterate can still perform a significant number of unskilled job in the national economy"); *Hashem v. Astrue*, No. 4:10-CV-3053, 2011 WL 2550848, at *15 (D. Neb. June 27, 2011) (citing *Charles* and finding that the ALJ "resolved the apparent conflict between the VE's opinion and the DOT by determining that the VE's opinion was reasonable"). This persuasive authority supports a determination that Plaintiff could perform jobs with a language development level one, including those identified here, because the VE explained how an illiterate individual lacking a formal education, like Plaintiff, could work independently once she was shown how to do the job. (R. at 69); *see Charles*, 291 F. App'x at 555; *Spears*, 2015 WL 7307247, at *4.[8]

Plaintiff also argues that the ALJ "failed to make a finding of fact" regarding her "educational background or literacy" in her decision and that she failed to mention this finding to the VE and to include it in the hypothetical. (doc. 20 at 13.) The hearing transcript shows that the ALJ addressed Plaintiff's educational background in her decision at least 7 times, finding that

---

[8] *But see Geans v. Comm'r of Soc. Sec.*, No. 3:19-CV-368-HTW-JCG, 2020 WL 3866661, at *4 (S.D. Miss. June 8, 2020) ("Given the lack of evidence showing that Geans was literate and ALJ's failure to address the language or degree requirements of the identified jobs, the undersigned recommends that this case be remanded for the Commissioner to consider Geans' illiteracy and education level and their impact on his ability to perform other work."), *report and recommendation adopted sub nom. Geans v. Berryhill*, No. 3:19-CV-368 HTW-JCG, 2020 WL 3841305 (S.D. Miss. July 7, 2020); *Edmond v. Berryhill*, No. 3:18-CV-0677-BH, 2019 WL 1424612 (N.D. Tex., Mar. 29, 2019) (finding that the ALJ's failure to discover and address the language development conflict was prejudicial because further questioning and clarification from the VE "might have led to a different decision"); *Olive v. Colvin*, No. CV 16-559, 2017 WL 1653303, at *7 (E.D. La. Mar. 31, 2017) (remanding because "there is no testimony or other evidence in the record to support the conclusion that the[] [identified jobs] could be performed by an illiterate person"), *report and recommendation adopted*, No. CV 16-559, 2017 WL 1592488 (E.D. La. Apr. 28, 2017); *Pinto v. Massanari*, 249 F.3d 840, 847 (9th Cir. 2001) (acknowledging that a "claimant is not *per se* disabled if he or she is illiterate" but reversing because ALJ failed to explain the decision to deviate from the DOT's language requirement).

Plaintiff was illiterate, lacked a formal education, and lacked or had a limited fund of knowledge. (R. at 21, 23-25, 27.) In addition, within the VE's presence, Plaintiff's attorney represented that Plaintiff was illiterate, the ALJ examined Plaintiff about her native language Burmese and her ability to read and write more than her name, and Plaintiff responded, "I understand very basic English". (R. at 58-59.) Finally, the VE considered a first hypothetical individual with Plaintiff's education who could learn by hands-on and verbal demonstration—a limitation that the ALJ's decision specifically attributed to Plaintiff's "lack of general education" and "limited fund of knowledge". (R. at 25, 68.) Accordingly, the ALJ made findings of fact as to Plaintiff's illiteracy and educational background.

Even if the ALJ had not made these findings, Plaintiff has not presented any evidence showing that she required literacy and a formal education to perform the identified jobs. (*See* doc. 20); *see Lopez v. Comm'r of Soc. Sec.*, No. 6:20-CV-1118-GKS-GJK, 2021 WL 8017824, at *7 (M.D. Fla. Oct. 22, 2021) (finding that the claimant "failed to identify how her inability to [read or write] negates her ability to perform the[] jobs" identified), *report and recommendation adopted sub nom. Mendez Lopez v. Comm'r of Soc. Sec.*, No. 6:20-CV-1118-GKS-GJK, 2022 WL 970185 (M.D. Fla. Mar. 30, 2022). Notably, Plaintiff did not reply to the Commissioner's contention that she demonstrated the ability to perform as a kitchen helper for about four months at a level of substantial gainful activity despite her "language barrier". (doc. 23 at 4 (citing R. at 336)); *see*, *e.g., Sellers v. Saul*, No. 1:19-CV-362, 2021 WL 9526872, at *10 (E.D. Tenn. Mar. 24, 2021) (citing *Charles* and noting that the claimant performed jobs in the past with a language development level of up to two "demonstrating that such requirements do not preclude [her] from working, even if [s]he is illiterate"); *Migues* 2019 WL 6827225, at *9 (noting that the claimant "worked in the oilfield for several years without being able to read, performing work that the DOT

classifies as requiring at least some literacy"); *Spears*, 2015 WL 7307247, at *5 ("[A]lthough Spears was no longer capable of performing past relevant work as a chicken de-boner, the DOT classifies this job as requiring language level 1[,] … [yet] Spears performed this previous job up until the alleged onset of disability."); *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002) ("Donahue had a job for a long time despite his poor reading skills").

The ALJ did make findings of fact as to Plaintiff's literacy and educational background, and she properly rejected the DOT language development requirements in favor of the VE's opinion that Plaintiff could, despite her illiteracy and lack of education, perform as a kitchen helper, laundry worker, industrial cleaner, and store laborer. *See Charles*, 291 F. App'x at 555; *Hashem*, 2011 WL 2550848, at *15. Remand is not warranted on this issue.

## C.  Ability to Communicate in English

Plaintiff also argues that the VE's testimony as to Plaintiff's inability to verbally communicate in English conflicts with the ALJ's finding that she could learn by demonstration "where her supervisor delivers work instructions verbally and [she] must give verbal confirmation of understanding". (doc. 20 at 14-15) (internal quotation marked omitted). She also argues that the ALJ failed to find that she was unable "to communicate verbally in English". (*Id.* at 14.)

On February 25, 2020, the Social Security Administration (SSA) published a final rule[9], amending 20 C.F.R. §§ 404.1564(b) and 416.964(b), no longer requiring the Commissioner to consider a claimant's ability to communicate in English when evaluating her educational level at

---

[9] "A final rule, in the context of administrative rulemaking, is a federal administrative regulation that advanced through the proposed rule and public comment stages of the rulemaking process and is published in the Federal Register with a scheduled effective date." *Final Rule*, Ballotpedia.org, https://ballotpedia.org/Final_rule#:~: text=A%20final%20rule%2C%20in%20%20a%20scheduled%20effective%20date (last visited May 15, 2023) (citation omitted). "The published final rule marks the last stage in the rulemaking process and includes information about the rationale for the regulation as well as any necessary responses to public comments." *Id.*; *see also* Office of the Federal Register, *A Guide to the Rulemaking Process*, www.federalregister.gov/uploads/2011/ 01/the_rule making _process.pdf (last visited May 15, 2023).

step five.[10] *See Salimeh N. v. Comm'r of Soc. Sec.*, No. C21-1523-SKV, 2022 WL 1963719, at *4-5 (W.D. Wash. June 6, 2022) (citing Removing Inability to Communicate in English as an Education Category (Final Rule), 85 Fed. Reg. 10586, *available at* 2020 WL 885690 (S.S.A. 2020); comparing 20 C.F.R. § 416.964 (version in effect on Feb. 25, 2020) with 20 C.F.R. § 416.964 (as amended)). In discussing the final rule, SSR 20–01p states:

> When determining the appropriate education category, we will not consider whether an individual attained his or her education in another country *or whether the individual lacks English language proficiency*. Neither the country in which an individual was educated nor the language an individual speaks informs us about whether the individual's reasoning, arithmetic, and language abilities are commensurate with his or her formal education level.

*See* 2020 WL 1285114, at *2 n.8, *3; *see also* Final Rule, 85 Fed. Reg. at 10588 (explaining that data and research showing that "employment rates for people with limited English proficiency have increased since 1980, … suggests that English proficiency is no longer a useful category describing a claimant's 'educational attainment or of the vocational impact of an individual's education for the purposes of our programs'" as it was when the former regulation was published).

Although no court in the Fifth Circuit appears to have applied the final rule, and neither the ALJ nor the parties discussed the revised regulation, courts across the country have held that an ALJ is no longer required to make a finding on the claimant's English proficiency in considering her educational level. *See*, *e.g., Gina C. v. Comm'r of Soc. Sec. Admin.*, No. 3:21-CV-00423(SALM), 2022 WL 167922, at *11 (D. Conn. Jan. 18, 2022) ("Accordingly, because the SSA eliminated the inability to speak English from its consideration at step five, the ALJ was not required to consider, or otherwise make a finding that plaintiff 'cannot communicate in English[,]'

---

[10] The SSA removed the education category of "inability to communicate in English" "for all pending claims, [continuing disability reviews], and new applications" on or after April 27, 2020. *See* Removing Inability to Communicate in English as an Education Category, 85 Fed. Reg. 10586, 10596 (S.S.A. 2020). Because Plaintiff's case was pending as of the effective date, the 2020 regulation applies. *See Salimeh N. v. Comm'r of Soc. Sec.*, No. C21-1523-SKV, 2022 WL 1963719, at *4 (W.D. Wash. June 6, 2022) (applying the 2020 regulation to a claim for benefits that was filed in March 2019 but was pending on the effective date).

when assessing her education skills."); *Salimeh N.*, 2022 WL 1963719, at *5 (citing the revised regulation and finding that the claimant "has cited no authority requiring an ALJ to address English proficiency limitations in an RFC assessment or a VE hypothetical under the current regulatory scheme"); *Arias v. Comm'r of Soc. Sec. Admin.*, No. CV-22-08123-PCT-DMF, 2023 WL 2909220, at *4 (D. Ariz. Apr. 12, 2023) (citing *Salimeh N.* and finding that "Plaintiff has not shown any current authority suggesting that the ALJ improperly failed to consider the extent of Plaintiff's English language abilities"). The final rule explains that "the fact that the DOT includes a language component is not dispositive" for claimants, like Plaintiff who was 32 years old on the date she filed her application. (R. at 248, 253); 85 Fed. Reg. at 10591. "[E]ven under the prior rules, the inability to communicate in English 'has no impact on disability determinations for claimants under age 45[,]' which 'underscores that the ability to communicate in English is not an influencing factor as a matter of general principle.'" *Pichardo v. Comm'r of Soc. Sec.*, No. 21-CV-06873 (SDA), 2023 WL 2596970, at *20 (S.D.N.Y. Mar. 22, 2023) (quoting the final rule); *Abadi v. Saul*, No. 20-11560, 2021 WL 4270370, at *7 (E.D. Mich. July 16, 2021) (finding that "even if Plaintiff were unable to communicate in English this would not warrant a *de facto* finding of disability"), *report and recommendation adopted*, No. 20-11560, 2021 WL 4264748 (E.D. Mich. Sept. 20, 2021).

Given the language of the final rule, and the persuasive reasoning of other courts, the ALJ did not err in not making a finding on Plaintiff's ability to communicate in English because it was not required, and there was no conflict with the DOT for her to resolve. Because the ALJ did not make a finding regarding Plaintiff's ability to communicate in English, there is no conflict between the VE's testimony and the ALJ's RFC as to Plaintiff's learning by demonstration. *See generally Pichardo*, 2023 WL 2596970, at *20 (citing the DOT (4th ed. 1991), App. C, 1991 WL 688702,

and noting that "except in the speaking requirement of Language Level 3, the DOT itself makes no reference to English as the required language").

Even if there is a conflict between the VE's testimony and the ALJ's RFC, it would not be direct or obvious, and would instead be an implied or indirect conflict. *See Nichols*, 2011 WL 2669056 at *6; *see also Zapata v. Colvin*, No. 4:13-CV-340-Y, 2014 WL 4354243, at *11 (N.D. Tex. Sept. 2, 2014) (noting the difference between direct and implied conflicts with a VE's testimony). Plaintiff did not identify any conflict at the administrative hearing, and as noted, "[t]he Fifth Circuit has held that claimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present the conflict as reversible error when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing." *Zapata*, 2014 WL 4354243, at *11 (citing *Carey*, 230 F.3d at 142); *see also Ruffin v. Colvin*, No. 3:16-CV-18-DPJ-FKB, 2017 WL 536549, at *6 (S.D. Miss. Feb. 8, 2017) (finding that an "unexplained" conflict did not require remand because the plaintiff "failed to raise it before the hearing officer"). Remand is not required on this issue.

## IV.    CONCLUSION

The Commissioner's decision should be **AFFIRMED**.

**SO ORDERED** on this 29th day of June, 2023.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

**INSTRUCTIONS FOR SERVICE AND**
**NOTICE OF RIGHT TO APPEAL/OBJECT**

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

24